**Electronically Filed
Supreme Court
SCWC-14-0000828
16-MAY-2017
08:20 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

COUNTY OF KAUA'I,
Respondent/Plaintiff-Appellee,

vs.

HANALEI RIVER HOLDINGS LIMITED, a Cook Islands corporation;
MICHAEL GUARD SHEEHAN;
Petitioners/Defendants-Appellants,

and

PATRICIA WILCOX SHEEHAN, as Trustee of that certain unrecorded
Revocable Trust Agreement of Patricia Wilcox Sheehan, dated
December 21, 1994; PATRICIA WILCOX SHEEHAN; GAYLORD H. WILCOX;
DANIEL H. CASE; GROVE FARM COMPANY, INC., a Hawai'i corporation;
HUGH W. KLEBAHN; DONN A. CARSWELL; PAMELA W. DOHRMAN;
ROBERT D. MULLINS; WILLIAM D. PRATT; RANDOLPH G. MOORE;
and the Heirs and/or Assigns of JOHN B. BROSSEAU, also known as
JOHN BROSSEAU, JOHN B. BRASSEAU and J.B. BRASSEAU;
Respondents/Defendants-Appellants.

SCWC-14-0000828

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0000828; CIV. NO. 11-1-0098)

MAY 16, 2017

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY NAKAYAMA, J.

**I. INTRODUCTION**

This case concerns the condemnation of three parcels of privately-owned property and presents the following three issues: (1) whether two parcels of land must physically abut in order for a condemnee to be entitled to severance damages when one of the parcels is condemned; (2) whether blight of summons damages only begin to accrue after each condemnee has established its entitlement thereto and; (3) whether a condemnor may withdraw a portion of its estimate of just compensation based on an updated estimate of the property's value, after the deposit has been made and the condemnor has taken possession of the property.

For the reasons stated below, we hold that: (1) the presence or lack of physical unity is not dispositive of whether a condemnee is entitled to severance damages; (2) a deposit of estimated just compensation does not become conditional, and blight of summons damages do not begin to accrue, when a condemning authority objects to a condemnee's motion to withdraw funds based on the fact that the condemnee's entitlement to such funds is unclear and; (3) the court in an eminent domain proceeding has the discretion to permit a governmental entity to withdraw a portion of a deposit of estimated just compensation when the deposit has not been disbursed to the landowner, the

2

government acted in good faith in seeking to adjust the estimate to accurately reflect the value of the property on the date of the summons, and the adjustment will not impair the substantial rights of any party in interest.

Therefore, we affirm the Intermediate Court of Appeals's May 11, 2016 judgment on appeal entered pursuant to its March 31, 2016 published opinion, which affirmed the Circuit Court of the Fifth Circuit's (circuit court) final judgment except with regard to the award of blight of summons damages, but on different grounds with regard to the defendants' entitlement to severance damages.

## II.  BACKGROUND

This case concerns the condemnation of three parcels of privately-owned land (Parcels 33, 34, and 49).  In October 2004, Michael G. Sheehan (Sheehan) acquired his ownership interests in Parcels 33 and 34 from the Patricia Wilcox Sheehan Trust.  At that time, a portion of Parcel 49 was also a part of Parcel 33.  Parcel 49 was later created through consolidation and re-subdivision of neighboring lands.  On October 19, 2011, Sheehan transferred ownership of Parcels 33 and 34 to Hanalei River Holdings, Ltd. (HRH), but retained his fee simple title to Parcel 49.  Geographically, the subject area consists of "three adjoining irregular shaped parcels[,]" Parcels 49, 33 and 34

3

respectively, "located along the east side and toward the end" of a road in Hanalei, Kaua'i. "Parcels 33 and 34 [are both adjacent to each other, and] front along the Hanalei River along their northern boundaries while Parcel 49 is one lot removed from the river."

Although it is not being condemned by the County of Kaua'i (the County), a piece of property referred to by the parties as Area 51 is also relevant to this case. Area 51 includes land immediately to the east of Parcel 34. Area 51 is also a part of Lot 127, owned by Patricia Wilcox Sheehan.[1] In 2004, Patricia Wilcox Sheehan granted Sheehan an easement over Area 51 to operate a boatyard. This easement provided in pertinent part:

> AND THE GRANTEE does hereby covenant and agree:
>
> (1) That Grantee his successors and assign's easement to use the premises shall be limited solely for a boat baseyard as that use is permitted by the 'Decision and Order' of the Planning Commission of the County of Kauai, under its Special Management Area Use Permit, SMA(U)-87-8; Special Permit SP-87-9; Use Permit U-87-32, and Class IV Zoning Permit Z-IV-87-40, dated June 24, 1987.
>
> . . . .
>
> (3) That in the event the Special Management Area Use Permit, SMA(U)-87-8; Special Permit SP-87-9; Use Permit U-87-32, and Class IV Zoning Permit Z-IV-87-40, and the

---

[1] In 2006, Patricia Wilcox Sheehan gave Sheehan a quitclaim deed conveying Area 51, an unsubdivided portion of Lot 127; however, the Land Court mistakenly construed the deed as a conveyance of the entirety of Lot 127. In response, Sheehan quitclaimed Lot 127 back to Patricia Wilcox Sheehan on February 18, 2013. As of August 8, 2013 however, the new Transfer Certificate of Title had not yet been generated by the Land Court.

> authority to use the easement premises as a boat baseyard is withdrawn, cancelled or revoked by the Planning Commission of the County of Kauai, State of Hawaiʻi, this 'Grant of Easement' shall expire and be null and void upon the recordation at the Bureau of Conveyances of the State of Hawaiʻi, of a certified copy of said action of the Kauai County Planning Commission disallowing any further use of the premises for a boat baseyard.

Sheehan's permits to operate a boatyard were revoked in 2010. Sheehan v. Cty. of Kauaʻi, 134 Hawaiʻi 132, 337 P.3d 53 (App. 2014); Sheehan v. Cty. of Kauaʻi, No. SCWC-11-601 (Haw. Jan. 16, 2015) (order rejecting application for writ of certiorari); Although Area 51 has not been designated by the County as a separate lot of record, it has been considered a separate lot of record for tax purposes as TMK No. (4) 5-5-01:51.

## A.  Circuit Court Proceedings

On May 31, 2011, the County filed a complaint and summons in the circuit court to condemn Parcels 33, 34, and 49 for use as a public park.  In the County's subsequently filed first amended complaint, HRH, Sheehan, and Patricia Wilcox Sheehan were listed among others as those who might have or claim some right, title, or interest in the Parcels.

On April 30, 2012, the County filed an ex parte motion for an order putting plaintiff in possession pursuant to Hawaiʻi Revised Statutes (HRS) § 101-29.  After the circuit court[2]

---

[2]     The Honorable Kathleen N.A. Watanabe presided.

5

granted the County's motion in an order filed on May 4, 2012, the County deposited estimated just compensation of $5,890,000 with the clerk of the court.

On July 3, 2012, Patricia Wilcox Sheehan filed an answer to the County's first amended complaint, which asserted that she is the "owner of the fee simple interests, easements, rights of way or the express contingent remainder man [sic], to all or portions of the real property" identified as Parcels 33, 34, and 49.  Patricia Wilcox Sheehan requested that the circuit court dismiss the complaint, and if it did not, that

> the respective interests of all Defendants in the property be determined and that appropriate orders be entered thereon, and that the Court determine and award the just compensation, including but not limited to blight of summons, to which Patricia W. Sheehan is entitled by virtue of the taking, and severance damages to the remaining property.

On August 16, 2012, HRH moved the circuit court to vacate the aforementioned order of possession because the initial appraisal of the subject property was seven months old on the date of summons, and consequently, HRH alleged it was "stale as a matter of law and did not in good faith represent the reasonable fair market value of the property."  The circuit court denied HRH's motion on September 13, 2012.

On March 11, 2013, the defendants filed an application for payment of estimated compensation pursuant to HRS §§ 101-31

6

and -37. The memorandum in support of the motion asserted that Sheehan was the legal owner of Parcel 49 and that HRH was the legal owner of Parcels 33 and 34. Patricia Wilcox Sheehan filed a statement of no position regarding HRH and Sheehan's application.

The County filed a memorandum in opposition to HRH and Sheehan's application on April 2, 2013. The County argued that HRH and Sheehan should not be allowed to withdraw the deposit until the respective interests of all the defendants was judicially determined. The County noted that Patricia Wilcox Sheehan, HRH, and Sheehan all had asserted an interest in the deposited money.

Additionally, in the same memorandum, the County noted that it was filing a separate motion to withdraw a portion of the deposit, based on an updated appraisal that reflected a lower estimate of compensation at $4,860,000. The County asserted that it "should not be jeopardized by having Movants withdraw more than the actual estimated value of the condemned property" because "[o]nce Movants withdraw [all] the money, the County would have no reliable means of recouping any excess payment."

On the same date that the County's opposition to HRH and Sheehan's application was filed, the County also filed a motion to withdraw $1,030,000 from the amount it had deposited

7

with the clerk of the court in light of the second appraisal. Citing University of Hawaii Professional Assembly v. University of Hawaii, 66 Haw. 214, 221, 659 P.2d 720, 725 (1983), the County contended that "[p]ursuant to the doctrine of quasi estoppel, [the defendants] cannot now object to the County's obtaining an updated appraisal as of the date of summons[,]" because they had objected to the County's reliance upon the previous appraisal.[3]

On April 5, 2013, Patricia Wilcox Sheehan filed a waiver and release of any claims or interest in the proceeds payable by the County and consented to the disbursement of the proceeds to HRH and Sheehan. And on April 10, 2013, the County, HRH, and Sheehan entered into an agreement regarding the withdrawal of the deposit. In addition to an agreement that the County would stipulate that Sheehan and HRH could withdraw $4,860,000, Sheehan agreed to indemnify the County if HRH failed to repay any money that exceeded the jury verdict on Parcels 33 and 34. That same day, the parties filed a stipulation agreeing that Sheehan and HRH could withdraw $4,860,000 (the amount of the

---

[3]     In University, this court noted that "quasi estoppel is grounded in the equitable principle that one should not be permitted to take a position inconsistent with a previous position if the result is to harm another." 66 Haw. at 221, 659 P.2d at 725.

second appraisal) minus taxes, to be apportioned among the three parcels as stated in the stipulation.

On April 22, 2013, the defendants filed a motion in opposition to the County's motion to withdraw a portion of the deposit, alleging that there is no provision in HRS Chapter 101 permitting the County to offer a new estimate as a basis for withdrawing funds after it had already seized the subject property and the condemnees have applied for release of the funds, that the defendants consequently waived all defenses to the condemnation action besides an assertion of greater compensation or damages, and that the funds deposited constituted an estimate of the subject property's value at the time the County seized the property. Following a hearing, the County's motion to withdraw $1,030,000 was granted on May 13, 2013.

The circuit court's scheduling order for trial required Sheehan and HRH to produce their appraisal reports of the properties. In the defendants' expert report, Sheehan and HRH's valuation expert, Paul Cool (Cool), provided valuation estimates for Parcels 33, 34, and 49. Additionally, Cool also included a valuation of damages to Area 51 in his report. Specifically, Cool's report stated,

9

> Area 51 consists of the lands immediately east of Parcel 33.[4]  In the past, Michael G. Sheehan has used this area, together with Parcels 33 and 34 as a boatyard and in conjunction with boat and ocean activity operators from the property since the late 1980s.  Improvements include:
>
> > -Canoe pavilion with kitchen
> > -Restroom facility
> > -Outdoor shower
> > -Boat wash down facility.
>
> Over the years, the relationship between Mr. Sheehan and the County with regards to these operations have been contentious.  The County has challenged and continues to challenge the legality of operations. Matters are pending before the State of Hawaiʻi Intermediate Court of Appeals.
>
> The taking of the three Hanalei River parcels will require operations to be consolidated onto Area 51. While having no contributory value to the highest and best use of the three Hanalei River parcels, the improvements on Parcels 33 and 34 are integral to continued activities that remain on Area 51.

Cool opined that Area 51 suffered severance damages in an amount of $250,000 to $300,000 caused by the taking of Parcels 33, 34 and 49.  Prior to Cool's report, neither HRH nor Sheehan asserted a claim for severance damages in their answers, their pretrial statement, or elsewhere in the record.  Sheehan claims an interest in Area 51 due to the boatyard easement that was granted to him by Patricia Wilcox Sheehan in 2004.

On August 13, 2013, the County moved for partial summary judgment against HRH and Sheehan on the issue of severance damages.  On September 3, 2013, HRH and Sheehan opposed

---

[4]     While Cool stated that "Area 51 consists of lands immediately east of Parcel 33[,]" he likely intended this as Parcel 34.  Tax maps indicate that Area 51 is in fact directly to the east of Parcel 34, and not 33.

the motion, and supported the opposition with a declaration from counsel, an unsigned declaration from Sheehan,[5] and a Parcel history report for Area 51.[6]  The circuit court granted the County's motion based on its finding, inter alia, that Area 51 and Parcel 49 did not meet the three unities test as set forth in City and County of Honolulu v. Bonded Investment Co., 54 Haw. 523, 525, 511 P.2d 163, 165 (1973) [hereinafter "Bonded Inv. II"], as there was neither unity of title, physical unity, nor unity of use between Parcel 49, the condemned parcel, and Area 51, the area in which Sheehan had asserted a right to severance damages.

Jury trial began on November 4, 2013, and the jury reached a decision on the condemnation action on November 8,

_____

[5]  Sheehan later filed a signed declaration with the court on March 27, 2014.  The declaration stated:

> 1.   I am one of the Defendants in this case.
> 2.   The boatyard is situated on lots 33, 34, 49, 50 and Area 51.  I call it Area 51 because I received a separate TMK for the lot and its last two numbers were 51.  The maintenance shed, office structure, part of the wash-down facility, and its leach field are located on Area 51.
> 3.   Contrary to the County's position, the Grant of Easement remains in full force and effect.  It has not been cancelled by my former wife.
> 4.   All lots, including Area 51 were integral parts of my boatyard.  I have always considered and treated the lots to be one larger tract of land –- my boatyard.

[6]  A County Parcel History report retrieved on July 31, 2012 states, "OWNERS REPRESENTATIVE REQUESTS NEW TMK: 5501-51" with an effective date of October 24, 1991, and approval date of May 7, 1998.  Owner is listed as the Patricia Sheehan Trust.

2013.  The jury awarded compensation for each of the three
Parcels, valuing Parcel 33 at $2,030,000, Parcel 34 at
$3,016,000, and Parcel 49 at $754,000.  The verdict thus totaled
$5.8 million.

On November 18, 2013, the County filed its motion for
blight of summons damages.  The County asserted that damages
should be measured for two time periods:

> (1) from May 31, 2011 (the date of summons) until May
> 4, 2012 (the date the County deposited estimated just
> compensation of $5.89 million pursuant to the Order
> putting the County into possession) measured at 5%
> simple interest/year on the jury verdict of $5.8
> million, and (2) from April 29, 2013 (the date of
> entry of the Order Granting the County's Motion to
> Withdraw Portion of Deposit) until the date the County
> pays Defendants $940,000, which is the difference
> between $4.86 million and the jury verdict.

In their response, Sheehan and HRH agreed that the first time
period on the $5.8 million jury verdict should be calculated
from May 31, 2011 through May 4, 2012.  However, the defendants
contended that because the County moved to reduce the initial
estimate deposited with the court, the deposit was not an
unconditional deposit that was exempt from interest, and that
therefore, the proper calculation for the interest on the
$940,000 difference is from May 4, 2012 through the date that
the County paid the defendants in full.

At a hearing on the State's motion held on January 8,
2014, the circuit court found that the County's deposit was

12

unconditional and that the blight of summons damages stopped accruing on May 4, 2012.  The circuit court granted the County's motion for blight of summons damages on January 16, 2014, and on April 25, 2014, the circuit court issued its final judgment. The circuit court concluded that total just compensation for the condemned property was $5.8 million, and "[a]s additional just compensation, blight of summons damages at the rate of five percent (5%) per annum (without compounding) accrued" from "May 31, 2011 until County deposited $5,890,000 with the Clerk of Court," and from April 29, 2013 until the County paid the defendants in full.

## B.   Intermediate Court of Appeals Proceedings

The defendants appealed to the Intermediate Court of Appeals (ICA) and asserted three points of error: (1) "The trial court erred when it permitted the County to withdraw a portion of the estimate of just compensation after Defendants-Appellants applied for its release"; (2) "The trial court erred when it granted summary judgment in favor of the County on the issue of severance damages"; and (3) "The trial court erred in its calculation of blight of summons damages."

The ICA vacated the circuit court's award for blight of summons damages and affirmed the circuit court in all other respects.  Cty. of Kauaʻi v. Hanalei River Holdings, Ltd., 137

13

Hawaiʻi 471, 474, 375 P.3d 250, 253 (App. 2016).  Addressing the circuit court's order allowing the County to withdraw a portion of its estimated just compensation, the ICA reviewed HRS §§ 101-29, -30, and -31 and noted that the statutes do not expressly authorize the withdrawal of a portion of the deposit.  Id. at 479-80, 375 P.3d at 258-59.  However, the ICA held that HRS § 101-19 "provides the court in an eminent domain action with broad authority to permit amendments to the proceeding . . . [and] authorized the circuit court to allow amendments 'in form or substance' of processes, motions, or other proceedings, as long as the 'amendment will not impair the substantial rights of any party in interest.'"  Id. at 480, 375 P.3d at 259 (footnote omitted).

The ICA also held that under federal case law, which was cited favorably by this court in City and County of Honolulu v. Bonded Investment Co., 54 Haw. 385, 507 P.2d 1084 (1973) [hereinafter "Bonded Inv. I"], the government is allowed to withdraw the excess of the cash deposited following a revised estimate of just compensation.  Id. at 481, 375 P.3d at 260 (citing United States v. 1,997.66 Acres of Land, More or Less, in Polk Cty., Iowa, 137 F.2d 8, 13 (8th Cir. 1943)).  The ICA concluded:

14

> Based on HRS § 101-19 and persuasive federal case law, we hold that the court in an eminent domain proceeding may permit a governmental entity to withdraw a portion of the estimated just compensation deposit that has not been dispersed to the landowner when the governmental entity, acting in good faith, seeks to adjust the estimate to accurately reflect the value of the property on the date of summons and the adjustment will not impair the substantial rights of any party in interest.

Id.

Applying the new standard to this case, the ICA concluded that the circuit court did not abuse its discretion in allowing the County to withdraw part of its deposit because (1) the deposit had not been disbursed yet; (2) the County appeared to have acted in good faith because the withdrawal was based on an updated appraisal, which the defendants had previously requested; and (3) the withdrawal of a portion of the estimated just compensation did not impair the defendants' substantial rights. Id. at 481-82, 375 P.3d at 260-61.

Regarding severance damages, the ICA first held that Sheehan's unsigned declaration, the sole paper upon which the defendants relied to raise a genuine issue of material fact, did not constitute admissible evidence under Rule 56(e) of the Hawaiʻi Rules of Civil Procedure (HRCP) because it violated Rule 7(g) of the Rules of the Circuit Courts of the State of Hawaiʻi, which sets forth the requirements for when a declaration may be submitted in lieu of an affidavit. Id. at 483, 375 P.3d at 262.

15

The ICA also rejected Sheehan's contention that, under Bonded Inv. II, there is no requirement that all of the pertinent lots physically abut one another in order to meet the three unities test. Id. The ICA concluded that no genuine issue of material fact existed as to Sheehan's inability to satisfy the three unities test, and that therefore, Sheehan was not entitled to severance damages for Area 51 as a matter of law. Id. at 483-84, 375 P.3d at 262-63.

As for blight of summons damages, the ICA noted that the only issue raised on appeal was whether the County's deposit of estimated just compensation was conditional, such that the deposit did not stop accruing interest. Id. at 485, 375 P.3d at 264. The ICA determined that at the time the deposit was made, there were no express conditions placed on the deposit. Id. The ICA also held that the County's opposition to the defendants' withdrawal of the deposit based on lack of clear title was not a condition because, pursuant to HRS § 101-31, "a party must be entitled to the just compensation in order to receive payment of the estimated amount deposited with the court. Requiring a party to demonstrate entitlement to the money does not constitute placing a condition upon the deposit." Id. at 486, 375 P.3d at 265.

16

Following this reasoning, the ICA concluded that it was not until April 5, 2013 when Patricia Wilcox Sheehan waived any interest in the just compensation that "it became clear that the Sheehan Defendants were the parties entitled to just compensation." Id. at 487, 375 P.3d at 266. However, the ICA held that the deposit became conditional because the County did not agree to release the deposit until April 10, 2013, which is when Sheehan agreed to indemnify the County. Id. Therefore, the ICA concluded that blight of summons damages were as follows: (1) from May 31, 2011 to May 4, 2012, 5% interest per annum on the $5.8 million jury verdict; (2) from April 5, 2013 to April 10, 2013, 5% interest per annum on the $5.8 million jury verdict and; (3) from April 10, 2013 to the date upon which the defendants are paid in full, 5% interest per annum on $940,000. Id.

The defendants filed an application for writ of certiorari on July 11, 2016. Therein, the defendants presented this court with three questions for review: (1) "Must two parcels physically abut in order for the jury to consider whether they are part of a larger parcel?"; (2) "Where there are multiple properties being condemned from different owners, does statutory interest on a conditional deposit only accrue after each condemnee establishes an entitlement to its portion of the

17

deposit?" and; (3) "Does [HRS § 101-19] enable a condemnor to withdraw a portion of its estimate of just compensation after deposit with the Court and after taking possession of the property?"

The County responded to the defendants' application on July 25, 2016. On August 22, 2016, this court accepted the defendants' application for writ of certiorari.

## III.  STANDARDS OF REVIEW

### A.  Interpretation of a Statute

The interpretation of a statute is a question of law reviewable de novo.

> When construing a statute, our foremost obligation is
> to ascertain and give effect to the intention of the
> legislature, which is to be obtained primarily from
> the language contained in the statute itself.  And we
> must read statutory language in the context of the
> entire statute and construe it in a manner consistent
> with its purpose.

Ka Paʻakai O KaʻAina v. Land Use Comm'n, 94 Hawaiʻi 31, 41, 7 P.3d 1068, 1078 (2000) (quoting Amantiad v. Odum, 90 Hawaiʻi 152, 160, 977 P.2d 160, 168 (1999)).

### B.  Summary Judgment

"On appeal, the grant or denial of summary judgment is reviewed de novo."  Nuuanu Valley Ass'n v. City & Cty. of Honolulu, 119 Hawaiʻi 90, 96, 194 P.3d 531, 537 (2008).

> [S]ummary judgment is appropriate if the pleadings,
> depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if

18

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.

Id. (alteration in original) (quoting Kahale v. City & Cty. of Honolulu, 104 Hawaiʻi 341, 344, 90 P.3d 233, 236 (2004)).

## C.   Blight of Summons Damages Calculation

Blight of summons damages calculations are reviewed under the abuse of discretion standard. Hous. Fin. & Dev. Corp. v. Ferguson, 91 Hawaiʻi 81, 92, 979 P.2d 1107, 1118 (1999).

## IV.   DISCUSSION

HRH and Sheehan present the following questions to this court:

> QUESTION NO. 1.: Must two parcels physically abut in order for the jury to consider whether they are part of a larger parcel?
>
> QUESTION NO. 2.: Where there are multiple properties being condemned from different owners, does statutory interest on a conditional deposit only accrue after each condemnee establishes an entitlement to its portion of the deposit?
>
> QUESTION NO. 3.: Does [HRS § 101-19] enable a condemnor to withdraw a portion of its estimate of just compensation after deposit with the Court and after taking possession of the property?

## A.   Sheehan's Entitlement to Severance Damages

The defendants claim that the ICA erroneously concluded that properties must actually abut in order to meet

19

the three unities test for severance damages.  The defendants
assert that the majority of other jurisdictions treat the unity
of use factor as controlling, and have awarded severance damages
even if the properties are not physically contiguous.

HRS § 101-23 (1993) provides in pertinent part:

> If the property sought to be condemned <u>constitutes
> only a portion of a larger tract, the damages which will
> accrue to the portion not sought to be condemned by reason
> of its severance from the portion sought to be condemned,
> and the construction of the improvements in the manner
> proposed by the plaintiff shall also be assessed</u>, and also
> how much the portion not sought to be condemned will be
> specifically benefited, if at all, by the construction of
> the improvement proposed by the plaintiff.

(Emphasis added.)  This court has held that "the test generally
used by courts to determine whether a parcel to be acquired by
eminent domain proceeding is a part of a larger tract of land to
entitle owners to severance damages is that there must be unity
of title, physical unity and unity of use of the parcel taken
and parcel left."  <u>Bonded Inv. II</u>, 54 Haw. at 525, 511 P.2d at
165.

In <u>Bonded Inv. II</u>, the City and County of Honolulu
commenced eminent domain proceedings for the acquisition of Lot
65 of the Maili Beach Lots, and subsequently commenced another
proceeding to acquire Lots 59 and 60.  <u>Id.</u> at 524, 511 P.2d at
164.  Lot 65 adjoined Lot 59, and Lots 59 and 60 were contiguous
lots.  <u>Id.</u>  Consequently, the issue decided by this court in

20

<u>Bonded Inv. II</u> was whether Lots 65, 59, and 60 comprised one parcel or tract of land for purposes of severance damages.  <u>Id.</u> Prior to the condemnation proceedings, the owners had "consolidated Lots 57 and 58 into Lot 65 for the purpose of constructing a condominium apartment building[,]" and they contended that expenses incurred for the condominium project had enhanced the value of Lot 65.  <u>Id.</u>

The <u>Bonded Inv. II</u> court concluded that Lot 65 and Lots 59 and 60 did not constitute one parcel.  <u>Id.</u> at 527, 511 P.2d at 166.  This court noted:

> [T]he owners not only by choice and design had separated the use of Lot 65 from Lots 59 and 60, but also based on the use for which they had committed Lot 65 for a condominium apartment building, attempted to show that the value of the lot had been enhanced by the expenses incurred by them for the project.

<u>Id.</u> at 527, 511 P.2d at 166.  This court stated that "this factor is controlling here on the question whether Lots 65, 59 and 60 constituted one tract of land."  <u>Id.</u>  This court only briefly mentioned the other two unities, stating:

> There is no question as to the unity title and physical unity of the three lots.  However, we do not agree with the owners that these factors make Lot 65 part and parcel of a larger tract of land comprising Lots 59, 60 and 65 as they contend.  Here, as pointed out above, the uncontradicted evidence is that Lot 65 had been committed by the owners for a condominium apartment building independent and separate from Lots 59 and 60.  Thus, under the record of this case, we hold that as a matter of law Lot 65 was a separate and independent lot and not a part of a larger tract or parcel of land.

21

Id.

This court did not address the issue of whether parcels must physically abut in order to satisfy the three unities test for severance damages in Bonded Inv. II. More important, this court has yet to address whether each of the unities should be treated as essential elements, where it is necessary to satisfy each of the unities to satisfy the test, or as factors, where a court is given discretion to consider the totality of the circumstances.

Here, the ICA has interpreted the three unities as elements, given that it held that because Parcel 49 and Area 51 were not physically contiguous, the requirements of the three unities test had not been met. This interpretation appears to be supported by the general statement of the law, which states that "there must be unity of title, physical unity and unity of use of the parcel taken and parcel left." Bonded Inv. II, 54 Haw. at 525, 511 P.2d at 165 (emphases added). Employment of the words "must" and "and" suggests that all three unities are required. Morever, Bonded Inv. II's conclusion that the three unities test is not satisfied as a matter of law when just one of the unities is not present also supports an element-like approach.

22

However, there is also indication that <u>Bonded Inv. II</u> intended to present the three unities as factors, rather than elements.  The opinion twice refers to the unities as factors. <u>Bonded Inv. II</u>, 54 Haw. at 527, 511 P.2d at 166 ("[T]his <u>factor</u> is controlling here . . . we do not agree with the owners that these <u>factors</u> make Lot 65 part and parcel of a larger tract[.]" (emphases added)).  More significantly, the court stated that HRS § 101-23 "is an enactment of the common law rule established by courts of other jurisdictions" and that "the test adopted by other courts is fair and reasonable and should be followed by this court."  <u>Id.</u> at 525, 511 P.2d at 165.  A review of cases from other jurisdictions shows that the unities are generally treated as factors and not elements.

One of the cases that <u>Bonded Inv. II</u> cites to is <u>Barnes v. North Carolina State Highway Commission</u>, 109 S.E.2d 219 (N.C. 1959).  Therein, the North Carolina Supreme Court stated:

> There is no single rule or principle established for determining the unity of lands for the purpose of awarding damages or offsetting benefits in eminent domain cases.  The factors most generally emphasized are unity of ownership, physical unity and unity of use.  Under certain circumstances the presence of all these unities is not essential.  The respective importance of these factors depends upon the factual situations in individual cases. Usually unity of use is given greatest emphasis.
>
> . . . .

23

> The general rule is that parcels of land must be contiguous in order to constitute them a single tract for severance damages and benefits.  But in exceptional cases, where there is an indivisible unity of use, owners have been permitted to include parcels in condemnation proceedings that are physically separate and to treat them as a unit.

Id. at 384, 109 S.E.2d at 225.  Barnes clearly describes the three unities as factors and not as elements.  See id.

Several other jurisdictions have also recognized that where unity of use and unity of title are present, the lack of physical unity may not be determinative.  State ex. rel. Comm'r of Dep't of Corr. v. Rittenhouse, 634 A.2d 338, 343 (Del. 1993) ("[W]hen there is physical separation but unity of use can be demonstrated, a finding that a single tract existed is appropriate."); M & R Inv. Co v. State, 744 P.2d 531, 534 (Nev. 1987) ("The parcels damaged need not be physically contiguous to those taken so long as the evidence discloses an actual and existing unity of use and purpose and an existing, lawful and utilized access between the parcels." (footnote omitted)); Hous. Auth. of Norfolk Realty Co., 364 A.2d 1052, 1056 (N.J. 1976) ("The mere fact that the condemned parcel is physically separated from the remaining parcel does not foreclose a condemnee from recovering severance damages."); Sauvageau v. Hjelle, 213 N.W.2d 381, 389 (N.D. 1973) ("[T]racts physically separated from one another may constitute a 'single' tract if put to an integrated unitary use. . . . Integrated use, not

24

physical contiguity, therefore, is the test." (alterations in original)); State ex rel. Road Comm'n v. Williams, 452 P.2d 548, 549 (Utah 1969) ("[A]n award of severance damages to the remaining property is appropriate where two or more parcels of land, although not contiguous, are used as constituent parts of a single economic unit."); City of Los Angeles v. Wolfe, 491 P.2d 813, 819 (Cal. 1971) ("Unity of use if not the controlling factor is relevant, however, and may be considered where the properties are not physically contiguous").

Additionally, the Ninth Circuit has held that "the owner of one parcel in fee may be compensated for loss in market value thereof as a result of the taking of another parcel owned in fee by him, even if the latter is not contiguous, provided that, by actual and permanent use, a unitary purpose is served by both parcels." United States v. Honolulu Plantation Co., 182 F.2d 172, 178-79 (9th Cir. 1950). The Ninth Circuit has concluded that contiguity is not a requirement because a condemnee may still be harmed by a taking through a loss of unitary use of the condemned property. See Cole Inv. Co. v. United States, 258 F.2d 203, 204 (9th Cir. 1958) ("Integrated use, not physical contiguity, therefore, is the test." (citing Baetjer v. United States, 143 F.2d 391, 395 (1st Cir. 1944)).

25

In sum, the majority of jurisdictions have treated the unities as factors and not elements, and <u>Bonded Inv. II</u> expressed an intent to adopt the standard used by other courts. Accordingly, we hold that when determining whether a claimant is entitled to severance damages under the three unities test as articulated in <u>Bonded Inv. II</u>, the three unities should be evaluated and weighed against one another as <u>factors</u>, and should not be viewed as essential elements. The unity of use should be accorded more weight compared to the unity of title and physical unity. Consequently, a lack of physical unity will not be dispositive of a condemnee's claim for severance damages. Therefore, the ICA gravely erred to the extent that it applied the three unities as elements and barred Sheehan from claiming severance damages as a matter of law because Parcels 49 and Area 51 are not physically contiguous.

However, even under an application of the three unities as factors, Sheehan is not entitled to severance damages. None of the three unities are present in this case. Unity of use, the most important factor to this analysis, has not been met. Sheehan's claim to unity of use is based solely on the operation of a commercial boatyard. However, Sheehan's permits allowing him to operate the boatyard were revoked in June 2010, nearly a year before the County instituted the

condemnation action relevant to this appeal on May 31, 2011. Sheehan therefore could not have legitimately been using Area 51 as a boatyard when the County condemned Parcel 49. Thus, unity of use is not present.

Moreover, the other two unities, which are probative but receive less weight compared to the unity of use factor, are also not present here. There is no physical unity because Parcels 33 and 34 separate Parcel 49 and Area 51. Additionally, there is also no unity of title, because Sheehan does not own both of the properties that are purportedly two portions of a larger tract--he retained fee simple title to Parcel 49, but Patricia Wilcox Sheehan owned and continues to own Area 51. While Sheehan claims that he has a cognizable property interest in Area 51 by virtue of the easement that Patricia Wilcox Sheehan had granted him in 2004, his claim is not valid. Pursuant to the easement itself, the easement expired when Sheehan's permits to operate the boatyard were revoked.

To conclude, although we elect to interpret the three unities test articulated in Bonded Inv. II differently than the ICA, we affirm the ICA's judgment to the extent that it affirmed the circuit court's order granting summary judgment in favor of the County on the issue of severance damages. There is no genuine dispute of material fact that none of the three unities

27

are present between Area 51 and Parcel 49.  Sheehan therefore cannot prevail on his claim for severance damages as a matter of law.

## B.    Calculation of Blight of Summons Damages

The defendants contend that the ICA erroneously calculated blight of summons damages based on its conclusion that blight of summons interest will not accrue until entitlement thereto is established by a condemnee.  The defendants argue that as the ICA concluded that the deposit was conditioned on Sheehan's agreement to indemnify the County, there should have been no tolling because there is nothing in HRS Chapter 101 that requires a condemnee to prove entitlement in order for interest to accrue on a conditional deposit.  The defendants assert that the ICA's holding should be reversed, and that they be allowed 5% interest per annum on the $5.8 million jury verdict from the date of summons to the date that the County agreed to release the conditional deposit.[7]  The County responds that it stands by its position that the trial court did not abuse its discretion, and while it "disagrees with the

---

[7]     The defendants actually state that they should be allowed interest on $4.86 million during this period, but this appears to have been stated in error.  Consistent with the approach they took at the circuit court and the ICA, it is presumed that the defendants intended this to be $5.8 million.

28

conclusion of the ICA, it contends that the difference is not of a magnitude warranting this Court's further review."[8]

HRS § 101-33 (1993) provides in pertinent part:

If an order is made letting the plaintiff into possession as provided for in sections 101-28, 101-29, and 101-32, the final judgment shall include, as part of the just compensation and damages awarded, interest at the rate provided in section 101-25 from the date of the order until paid by the plaintiff; provided that . . . interest shall not be allowed upon any sum paid by the plaintiff to the clerk of the court from the date of the payment.

(Emphasis added.)

Blight of summons damages refers to "the indemnification due a condemnee for the damages resulting from the government's delay in paying the full cash equivalent of the property taken on the date of summons." City & Cty. of Honolulu v. Mkt. Place, Ltd., 55 Haw. 226, 235, 517 P.2d 7, 15 (1973) [hereinafter "Market Place"]. Specifically, "the purpose of blight of summons damages is to compensate a condemnee for the loss of use of the cash equivalent of the taken property[.]" Id. at 237, 517 P.2d at 16.

This court has held that

There are two basic varieties of blight of summons damages in Hawaii. One arises during the period between the date of order of possession under HRS §§ 101-28 or 29 and the date of final payment of just compensation to the defendant, and consists of interest at the statutory rate of 5% per annum provided in HRS §§ 101-33 and 25 applied during this period

---

[8]     The County notes that the ICA's blight of summons interest calculation results in an additional $6,419.18 for the defendants.

29

> to the amount by which the final award of just compensation
> exceeds the deposit of estimated just compensation upon
> which the order of possession was based.  The other arises
> during the period between the date of summons and the date
> of order of possession, and consists of interest also at a
> rate fo [sic] 5% per annum applied during this period to the
> final award of just compensation.

Id. at 235, 517 P.2d at 15-16 (emphases added) (footnote

omitted) (citations omitted).  Although this court referred to

the "date of the order of possession" in both periods, this

court later used the date of the deposit as the operative date

because HRS § 101-33 states that "interest shall not be allowed

upon any sum paid by the plaintiff to the clerk of the court

from the date of the payment."  Id. at 237, 517 P.2d at 16-17.

Therefore, in Market Place, even though the order of possession

was not issued until after the date that the City and County of

Honolulu (the City) deposited its estimated just compensation

with the court, this court held that the interest on the

unconditional deposit stopped running on the date that it was

deposited, not on the date of the order of possession.  Id.

Accordingly, blight of summons damages appear to be calculated

as follows: (1) 5% per annum on the final award of just

compensation from the date of the summons until the date of the

deposit of estimated just compensation, and (2) 5% per annum on

the amount by which the final award of just compensation exceeds

the amount of the deposit of estimated just compensation from the date of the deposit until the date of final payment.

In Market Place, this court addressed the blight of summons interest calculation on sums deposited by the plaintiff with the court. 55 Haw. at 236, 517 P.2d at 16. The City commenced eminent domain proceedings on August 25, 1969 for a parcel of oceanfront property for the purpose of extending a park. Id. at 227, 517 P.2d at 11. On May 28, 1970, the City deposited estimated just compensation in the amount of $961,500 with the trial court (first deposit) and on June 5, 1970, the trial court filed an order of possession for the City, to become effective on June 20, 1970, and approved the City's deposit with the court. Id. at 229, 517 P.2d at 12. The condemnees were served on June 10, 1970, but did not withdraw the deposit until June 15, 1970. Id.

On April 14, 1972, the jury determined that just compensation for the property was $1,036,571.61. Id. On May 19, 1972, prior to the entry of judgment, the City deposited an additional estimated just compensation in the amount of $75,071.61 with the court (second deposit), representing the difference between the jury verdict and the City's first deposit of estimated just compensation. Id. at 229-30, 517 P.2d at 12.

The second deposit was accompanied by a motion to approve the deposit with the following restriction on distribution:

> Plaintiff hereby consents to a court order of distribution of the additional deposit, provided that such order contain such protective measures to insure the return of any monies not lawfully due the distributees together with such additional interest, damages or charges for wrongful withdrawal of funds to which distributees may not be entitled.

Id. at 238, 517 P.2d at 17 (internal quotation marks omitted). "Because certain conditions were attached to this deposit . . . this sum was not withdrawn by the condemnees until June 2, 1972." Id. at 230, 517 P.2d at 12.

The trial court in Market Place "continued the running of interest on the amount of the first estimate of just compensation during the time lag of eighteen days between the deposit of the estimate and withdrawal thereof by the condemnees." Id. at 237, 517 P.2d at 16. However, this court held that the trial court erred in this conclusion because the City's first estimated deposit was unconditional, and pursuant both to HRS § 101-30 and HRS § 101-33:

> [I]t appears that there is no obligation on the part of the condemnor to pay interest to the extent that it makes an unconditional deposit of estimated just compensation with the clerk of the court. The City and County made such a deposit on May 28, 1970, and that is the date on which the trial court should have stopped the running of interest on the deposited sum as non-statutory blight of summons damages. . . . While the deposit was held by the court pending its 'further order or orders,' this was standard practice in the course of which the condemnees at any time could have moved for the withdrawal of the deposited sum under HRS § 101-31. There was, of course, a hiatus of 13

32

> days between the date of deposit and the date that the order
> of possession was served on the condemnees, during which the
> condemnees may not have been aware of the existence of the
> deposit.  However, this appears to be a necessary
> consequence of the legislative choice to stop the running of
> interest on the date of the payment of a deposit to the
> clerk of court rather than on the date of service of the
> order of possession.  Certainly this gap was not the fault
> of the City and County, which made an unconditional deposit
> on May 28, 1970.  In view of the clear statutory mandate of
> HRS § 101-33 against the running of interest beyond this
> date, the City and County should not have been penalized by
> an interest charge for the failure of the condemness [sic]
> to demand promptly their right to the deposited estimate.

Id. at 237-38, 517 P.2d at 16-17 (footnote omitted).

However, this court concluded that the City's second

deposit on May 19, 1972 was conditional and that interest

accrued from May 19, 1972 until the second deposit was released

on June 2, 1972.  Id. at 238-40, 517 P.2d at 17-18.  The court

noted that

> [i]t was not until June 2, 1972 that the trial court
> released the additional deposit to the condemnees,
> with interest computed at the rate of 5% to that date.
> The record shows that this delay was a direct result
> of the condition noted above and the opposition to
> immediate withdrawal voiced by counsel for the City
> and County at the hearing on his motion to approve the
> deposit.

Id. at 238-39, 517 P.2d at 17.  This court held that if a

condemnor could arbitrarily withhold its consent to a

distribution of deposited estimated just compensation, the

condemnee's right to interest could be substantially

circumvented.  Id. at 239, 517 P.2d at 18.  As such, this court

emphasized again that in order to avoid depriving a condemnee of

the use of an additional deposit of estimated just compensation

33

made subsequent to an order of possession, "money 'paid by the plaintiff to the clerk of the court' must be unconditionally for the use of the persons entitled thereto, in order to escape interest charges under HRS § 101-33." Id. at 240-41, 517 P.2d at 18-19 (citation omitted).

As applied to this case, there has never been a question at trial or on appeal that the defendants are entitled to interest of 5% per annum on the $5.8 million jury verdict from May 31, 2011 (the date of summons) until May 4, 2012 (the date of the deposit of estimated just compensation). The contention lies in the period from May 4, 2012 through the date of final payment.

### 1. The Initial Deposit Made On May 4, 2012 Was Unconditional.

The County's deposit of estimated just compensation was unconditional when it was initially made with the clerk of the court. Similar to the first deposit in Market Place, when the County deposited its estimated just compensation with the clerk of the court on May 4, 2012, the County did not enumerate any restrictions or limitations that would have prevented entitled individuals from withdrawing the funds immediately. See Market Place, 55 Haw. at 236-37, 517 P.2d at 16-17. Because entitled condemnees could have withdrawn the funds on the date

34

of deposit, the deposit was unconditional, and interest stopped accruing on the final award of just compensation on that date. See id. at 237-38, 517 P.2d at 16-17.

### 2. The Deposit Did Not Become Conditional on April 5, 2013.

With respect to the County's first objection to the defendants' motion to withdraw the funds, the defendants assert that under HRS § 101-31, condemnees are not required to prove their entitlement to compensation prior to receiving the funds. We disagree. Upon review of HRS § 101-31 and our opinion in Market Place, we agree with the ICA and hold that the deposit did not become conditional when the County opposed the release of the estimated just compensation on the grounds that title to the Parcels was not clear, and that requiring a party to demonstrate entitlement to the funds does not constitute placing a condition upon the deposit.

The plain language of a statute is the fundamental starting point for statutory interpretation. State v. Wheeler, 121 Hawaiʻi 383, 390, 219 P.3d 1170, 1177 (2009). "It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a

35

construction can be legitimately found which will give force to and preserve all the words of the statute." Camara v. Agsalud, 67 Haw. 212, 215-16, 685 P.2d 794, 797 (1984). This court must presume that the legislature meant what it said, and is barred from rejecting otherwise unambiguous statutory language. Sato v. Tawata, 79 Hawaiʻi 14, 23, 897 P.2d 941, 950 (1995).

HRS § 101-31 (1993) provides, in pertinent part:

> Upon the application of the parties entitled thereto the court may order that the amount of the estimated compensation or damages stated in the motion and paid to the clerk of the court, or any part thereof, be paid forthwith for or on account of the just compensation to be awarded in the proceedings . . . If the compensation or damages finally awarded in respect of the land or any parcel thereof exceeds the amount of the money so received by any person entitled, the court shall enter judgment for the amount of the deficiency.

(Emphases added.) In HRS § 101-31, the legislature took care to explicitly specify not once, but twice, that only "entitled" parties may withdraw or otherwise receive funds pursuant to HRS § 101-31. It follows that based on the plain language of HRS § 101-31, a condemnee who seeks to withdraw a portion of an estimated just compensation must meet the statutory prerequisite of being entitled to such funds by showing that he or she has clear and undisputable title to the condemned property.

Taken together with the principles from Market Place, it appears that requiring a party to demonstrate that it meets the statutory prerequisite under HRS § 101-31 does not render

36

the deposit conditional. As was the case with the first deposit in Market Place, any delay between the date of the deposit and the date of withdrawal that is a consequence of an issue as to whether a party is properly entitled to withdraw the funds is "not the fault of [the County]." 55 Haw. at 238, 517 P.2d at 17. The County therefore should not be "penalized by an interest charge" for delays stemming from the condemnees' disputed ability to demonstrate they meet the statutory precursor to withdrawing funds under HRS § 101-31 prior to seeking the withdrawal of funds thereunder. Id.

Accordingly, a deposit of estimated just compensation does not become conditional when a condemning authority objects to a condemnee's motion to withdraw funds based on the fact that the condemnee's entitlement to such funds is not clear. The ICA did not err when it held that "until April 5, 2013, any delay in the availability of deposited funds was not due to conditions placed by the County upon payment of the money," because "it was not clear which party was entitled to the just compensation[,]" due to the fact that Patricia Wilcox Sheehan had asserted that she was the "owner of the fee simple interests, easements, rights of way, or the express contingent remainder man [sic], to all or portions of the real property" in her answer to the County's first amended complaint.

### 3. The Deposit Became Conditional on April 5, 2013.

Although the deposit was initially unconditional when made, and remained unconditional in the wake of the County's first objection to the defendants' motion to withdraw the deposit, the deposit ultimately became conditional on April 5, 2013. On April 5, 2013, Patricia Wilcox Sheehan waived all claims or interests in the proceeds payable by the County and consented to the disbursement of the proceeds to the defendants. At that point, the defendants were clearly entitled to withdraw and utilize the deposited estimate of just compensation, and thereby satisfied the statutory prerequisite to receiving funds under HRS § 101-31. See HRS § 101-31.

The County did not agree to release the funds until April 10, 2013, when Sheehan agreed to indemnify the County in the event that HRH did not repay the County for funds in the excess of the jury verdict. Consequently, as was the case with the second deposit in Market Place, there was a delay between the date that the defendants were rightfully entitled to withdraw the funds and the date that they ultimately received them. See 55 Haw. at 238, 517 P.2d at 17. This "delay was a direct result of the condition" that the County imposed upon the release of the funds. Id. at 239, 517 P.2d at 17. Thus, the ICA did not err when it held: "The County's requirement of an

38

assurance that it could recover any excess payment made to HRH further delayed payment to the Sheehan Defendants, and this constituted a condition placed upon the deposit of estimated just compensation."

We therefore hold that a deposit made unconditionally at the outset may later become conditional if, after the initial unconditional deposit, the condemning authority opposes the withdrawal of the deposit to an entitled condemnee by imposing a subsequent condition upon the withdrawal of the funds.  The ICA explained how our holding rests on sound policy and is necessary to ensure the integrity of the statutory framework concerning the right to blight of summons damages when it stated:

> The supreme court noted in Market Place that '[i]f a condemnor were free to withhold arbitrarily its consent to a distribution of an additional deposit of estimated just compensation, it is evident that the right to interest under HRS [§] 101-33 could be circumvented in substantial measure.'  55 Haw. at 239, 517 P.2d at 18.  This statement is equally applicable in this case to the initial deposit of estimated just compensation where the County, on the eve of distribution, required conditions be satisfied to merit the County's acquiescence to the payment.  The County's position would, in effect, allow it to circumvent HRS §§ 101-29, 101-30, 101-31 and 101-33, by first depositing estimated just compensation to stop the running of interest on that amount, but then also conditioning access to that money by the 'persons entitled thereto' on the acceptance of 'protective measures.'

Hanalei River Holdings, 137 Hawaiʻi at 487, 375 P.3d at 266.

39

### 4. Final Calculation of Blight of Summons Damages

Based on the foregoing, we affirm the ICA's calculation of blight of summons damages, which is as follows: (1) 5% interest per annum on the value of the jury verdict ($5.8 million) from May 31, 2011 (the date of the summons) to May 4, 2012 (the date on which the County initially deposited the estimated just compensation); (2) 5% interest per annum on the value of the jury verdict ($5.8 million) from April 5, 2013 (the date that the defendants were entitled to withdraw the funds) to April 10, 2013 (the date Sheehan agreed to indemnify the County if HRH failed to repay any money that exceeded the jury verdict on Parcels 33 and 34) and; (3) 5% interest per annum on $940,000, reflecting the difference between the initial deposit and the jury verdict, from April 10, 2013 to the date upon which the defendants are paid in full.

### C. Withdrawal of Estimated Just Compensation

Lastly, the defendants ask this court to decide whether the ICA erred by holding that a condemnor may withdraw a portion of its estimate of just compensation deposited with the court after the condemnor has already taken possession of the condemnee's property. HRS §§ 101-29, -30, and -31 (1993) state the following regarding estimated just compensation:

40

HRS § 101-29. Possession pending action; alternative procedure

Where the plaintiff is the State or any county, the following alternative procedure may be followed.  At any time after the commencement of an action pursuant to this part, the State or any county may file a motion for an order of possession invoking this section and supported by an affidavit alleging, or by oral evidence prima facie showing:

. . . .

(3) The sum of money estimated by the State or county to be just compensation or damages for the taking of the real property.

Upon such motion and upon payment of such estimated sum of money to the clerk of the court for the use of the persons entitled thereto, the court shall issue an order ex parte putting the State or county in possession of the real property sought to be condemned

. . . .

HRS § 101-30. Order of possession

No order of possession shall issue unless the plaintiff has paid to the clerk of the court issuing the order, for the use of the persons entitled thereto, the amount of estimated compensation or damages stated in the motion for the issuance of the order . . . .

HRS § 101-31. Payment of estimated compensation; effect thereof

Upon the application of the parties entitled thereto the court may order that the amount of the estimated compensation or damages stated in the motion and paid to the clerk of the court, or any part thereof, be paid forthwith for or on account of the just compensation to be awarded in the proceedings. . . . A payment to any party as aforesaid shall be held to constitute an abandonment by the party of all defenses interposed by the party, excepting the party's claim for greater compensation or damages.  If the compensation or damages finally awarded in respect of the land or any parcel thereof exceeds the amount of the money so received by any person entitled, the court shall enter judgment for the amount of the deficiency.  The unexpended moneys and any additional security so deposited with the clerk of the court shall be available for, or for enforcement of, the payment of any final judgment awarded by the court.

These statutes do not expressly give the court authority to permit a plaintiff to withdraw estimated compensation once it has already been deposited with the court. However, HRS § 101-19 (1993) grants the court express authority to allow amendments to condemnation proceedings:

> In all proceedings under this part the court shall have power at any stage of the proceeding to allow amendments in form or substance in any complaint, citation, summons, process, answer, motion, order, verdict, judgment, or other proceeding, including amendment in the description of the lands sought to be condemned, whenever the amendment will not impair the substantial rights of any party in interest.

(Emphases added.)

Because the eminent domain statute does not state whether the County could or could not withdraw a portion of its deposited estimated just compensation, the ICA looked to both Bonded Inv. I and to federal case law for guidance.

In Bonded Inv. I, the City deposited $608,000 as estimated just compensation for parcel 63, but the jury awarded only $491,981.28 to the condemnees as just compensation for parcel 63.  54 Haw. at 388, 507 P.2d at 1087.  The circuit court allowed the condemnees to retain the full amount of estimated just compensation and disregarded the jury's verdict.  Id.  As to this ruling, this court concluded that the circuit court had erred, and held that after a determination is made on the final amount of just compensation, "any excess deposit must be set off

42

against a deposit that is deficient." Id. at 395, 507 P.2d at 1091.

The Bonded Inv. I court observed that although HRS § 101-31 only "provides for a deficiency judgment for the condemnee, in the event that the final award exceeds the estimate [and] HRS makes no provision to cover the situation where the verdict of the jury is less than the deposited estimate[,]" equitable principles required that the City be allowed to recover any excess and be awarded blight of summons damages on that excess. Id. In arriving at this conclusion, this court cited to United States Supreme Court case law interpreting the Federal Declaration of Taking Act on a similar provision:

> The purpose of the statute is twofold. First, to give the Government immediate possession of the property and to relieve it of the burden of interest accruing on the sum deposited from the date of taking to the date of judgment in the eminent domain proceeding. Secondly, to give the former owner, if his title is clear, immediate cash compensation to the extent of the Government's estimate of the value of the property. . . .

Id. at 393-94, 507 P.2d at 1090 (alteration in original) (quoting United States v. Miller, 317 U.S. 369, 381-82 (1943)). The Bonded Inv. I court held:

> We find that the [Federal Declaration of Taking Act's] purpose is similar to the purpose of HRS § 101. It is apparent that the statute's purpose is to avoid undue hardship by either party caused by protracted litigation. To hold the City rigidly to its estimate would penalize the City for utilizing a statutory

43

> procedure designed to alleviate hardships caused by the condemnation proceedings. City officials would tend to make low estimates so as to avoid any possibility that the deposit is excessive. The result of such understimation [sic] would be that the City would be compelled to pay interest on a larger sum from the date of taking to final award. In effect the condemnee gets less cash than what he would normally have received and the City must pay interest on a larger amount. Clearly, the policy of this statute cannot be served by such a harsh approach
>
> . . . .
>
> [W]e are of the opinion that an 'estimate of just compensation and damages' is just that-an estimate. It was not intended in any manner to be dispositive, final or binding as a settlement on the amount due. Its singular purpose is to serve the policy of HRS § 101-29-to alleviate the hardship due to the action. Thus, this estimate has no relevance to the conduct of the primary eminent domain proceeding to determine just compensation. It follows also that the estimate cannot serve as an admission against interest.

Id. at 394-95, 507 P.2d at 1090-91 (emphasis added).

Because Bonded Inv. I does not directly address the question of whether a plaintiff may withdraw a portion of its deposited estimated just compensation, the ICA looked to federal case law addressing this same issue under the Federal Declaration of Taking Act. In 1,997.66 Acres of Land, the Eighth Circuit Court of Appeals addressed this issue and held that:

> [T]here is nothing in the Declaration of Taking Act, inconsistent with an exercise of the implied, inherent authority of the district court to allow the United States to amend the declaration of taking filed in a condemnation proceeding, for the purpose of reducing (or increasing) an erroneous estimate of just compensation for the land taken, and to permit the Government to withdraw the excess of the cash deposited over the revised estimate.

137 F.2d at 13.  Consequently, in light of two established
purposes of the Federal Declaration of Taking Act, which the
court recognized were "to minimize the interest burden of the
Government in a condemnation proceeding, and to alleviate the
temporary hardship to the landowner and the occupant from the
immediate taking and deprivation of possession[,]" the Eighth
Circuit concluded that

> as a matter of fairness and sound practicality, the
> right should exist in the Government to amend its
> declaration of taking, for the purpose of correcting
> an erroneous estimate of just compensation and of
> enabling the Government to withdraw any excess of
> public funds deposited, in order to apply them to
> other uses and to pre vent [sic] waste.  The
> Declaration of Taking Act ought therefore to be
> construed as being consistent with the existence of
> such a right, unless this construction will do
> violence to the legislative language or to some
> substantive right of the landowner, created by the Act
> or otherwise existing.

Id. at 11.  The Eighth Circuit next addressed the issue of
whether the district court has the authority to refuse to allow
the government to revise its compensation estimate and withdraw
the excess where an error has been made, and held that the court
may refuse the above when either compensation has already been
paid out to the condemnee, or the government is found not to be
acting in good faith.  Id. at 14.

The ICA applied this test to the present case, and
concluded that the circuit court did not abuse its discretion in
allowing the County to withdraw $1.03 million of the estimated

45

deposit, because (1) estimated compensation had not been distributed to the defendants at the time the County moved to amend its estimate, (2) the County was acting in good faith on an updated appraisal that reflected a current value of the subject property as of May 31, 2011 (the date of summons), and (3) the County's withdrawal of partial estimated just compensation did not impair the substantial rights of the defendants.

Given our previous citation to and reliance on federal law interpreting the Federal Declaration of Taking Act, the ICA did not gravely err in similarly looking to federal case law regarding a condemnor's right to withdraw a portion of its estimated just compensation based on an erroneous or outdated appraisal. The rule adopted by the ICA is consistent with the purposes of HRS § 101-31 expressed by this court in Bonded Inv. I: avoidance of undue hardship to either party caused by protracted litigation.  Accordingly, we agree with the ICA and hold that the court in an eminent domain proceeding has the discretion to permit a governmental entity to withdraw a portion of a deposit of estimated just compensation when the deposit has not been disbursed to the landowner, the government acted in good faith in seeking to adjust the estimate to accurately reflect the value of the property on the date of the summons,

46

and the adjustment will not impair the substantial rights of any party in interest.

We also agree that under the foregoing rule, the circuit court in the present case did not abuse its discretion by permitting the County to withdraw a portion of the deposit of estimated just compensation. The County moved to withdraw the funds before the funds had been disbursed to the defendants. Moreover, the County was acting in good faith when it moved to withdraw the portion of the deposit, as its motion was based on an updated appraisal of the properties' value, which HRH had impliedly requested when HRH had challenged the County's initial appraisal as being stale as a matter of law. Finally, the defendants' burden of having their properties condemned was alleviated because they were able to withdraw $4.6 million prior to the final determination of just compensation. The defendants were further awarded blight of summons damages, and thus received full just compensation under the law.

Therefore, the circuit court did not abuse its discretion when it permitted the County to withdraw $1,030,000 from the amount that it had deposited with the clerk of the court in light of the second appraisal of the properties' value.

## V.  CONCLUSION

For the foregoing reasons, we affirm the ICA's May 11, 2016 judgment on appeal, which affirmed the circuit court's April 25, 2014 final judgment as to all claims and all parties, but on different grounds with regard to the defendants' entitlement to severance damages.

Richard E. Wilson
for petitioners

Mauna Kea Trask,
Rosemary T. Fazio,
and James K. Mee
for respondent
County of Kauaʻi

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson



48